Antonio Garcia Ellis
Oklahoma Dept. of Corrections # 408622
Oklahoma Department of Corrections

---

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANTONIO GARCIA ELLIS, <br>          Plaintiff, <br><br>    vs. <br><br><br> SCOTT CROW, Director, ODOC, and <br> WILLIAM "CHRIS" RANKINS, <br> Warden, Oklahoma State <br> Reformatory. | ) ) ) ) ) ) ) ) ) ) ) ) | Case Number:    CIV-22-406-PRW |

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254 AND MEMORANDUM BRIEF IN SUPPORT

ANDREA DIGILIO MILLER, OBA# 17019
Oklahoma Innocence Project
800 North Harvey Ave, Suite 317
Oklahoma City, OK  73102
Telephone: 405-208-6161
admiller@okcu.edu

Attorney for Petitioner
Antonio Garcia Ellis

May 18, 2022

.

# TABLE OF CONTENTS

Table of Authorities ........................................................................... i

Index of Attachments ....................................................................... vi

Custody Information and Procedural History .................................... 1

Statement of Facts ............................................................................ 3

Argument and Authority.................................................................. 26

    I.      Introduction..................................................................... 26

    II.    Timeliness of Petition, Exhaustion of State Remedies and Request for Transmission of State Record ......................................................... 27

    III.   The use of coercive police questioning of Michael Lang, a juvenile, that resulted in his making a false accusation against Antonio Ellis violated Mr. Ellis's right to due process and a fair trial in violation of the Fourteenth Amendment. ............................................................... 29

    IV.   The procedure used to secure Michael Lang's identification of Antonio Ellis as the person who shot David Terry was coercive, unnecessarily suggestive and thereby violated due process under the Fourteenth Amendment. ................................................................................. 31

    V.    Michael Lang's complete recantation of his statements to police and his trial testimony identifying Petitioner as being involved in the homicide requires vacating Mr. Ellis's Conviction. The state court's factfinding on this issue ignored substantial aspects of the trial and evidentiary hearing record and constitutes an unreasonable application of the facts in light of the evidence allowing this Court to grant habeas relief under 28 U.S.C. § 2254(d)(2). .................................................................. 35

VI.    The suppression of information relating to a photograph of Antonio Ellis being shown to Lang prior to Lang picking Petitioner out of the live line-up violated *Brady v. Maryland* and its progeny in violation of Petitioner's due process right to a fair trial. ..................................... 53

VII.    Constitutional error in Mr. Ellis's Trial resulted in the conviction of one who is factually innocent of the crime he was convicted of thereby entitling him to habeas relief under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. .............. 58

VIII.    The cumulation of error in this case resulted in the conviction of one who is factually innocent and requires the court to grant habeas relief in the interest of equity and justice. ................................................ 59

IX.    Prayer and Request for Relief .......................................................... 63

X.    Verification ..................................................................................... 63

XI.    Certificate of Electronic Filing........................................................ 63

*House v. Bell,*
    547 U.S. 518 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64
*J.D.B. v. North Carolina,*
    564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) . . . . . . . . . . . . . . .41
*Kyles v. Whitley,*
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57
*Manson v. Brathwaite,*
    432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) . . . . . . . . . . . . . . .36, 37
*McGuiggin v. Perkins,*
    569 U.S. 383 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
*Miller v. Fenton,*
    474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) . . . . . . . . . . . . . . . . .33
*Miranda v. Arizona,*
    384 U.S. 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
*Mooney v. Holohan,*
    294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) . . . . . . . . . . . . . . . . . . . .32
*Moran v. Burbine,*
    475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) . . . . . . . . . . . . . . . .33
*Napue v. Illinois,*
    360 U.S. (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58
*Neil v. Biggers,*
    409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) . . . . . . . . . . . . . . . . . .36
*Perry v. New Hampshire,*
    132 S.Ct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32, 33, 36, 37
*Rhines v. Webber,*
    544 U.S. 269 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
*Richardson v. State,*
    1979 OK CR 100, 600 P.2d 361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
*Rochin v. California,*
    342 U.S. 165 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
*Schlup v. Delo,*
    513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 64
*Simmons v. United States,*
    390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) . . . . . . . . . . . . . . . . .36
*Stano v. Dugger,*
    901 F.2d 898 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

*Strickler v. Green,*
   527 U.S. 263 (1999)............................................57
*United States v. Bagley,*
   473 U.S. 667 (1985).......................................57, 58
*United States v. Rivera,*
   900 F.2d 1462 (10th Cir. 1990)...........................62, 63
*United States v. Toles,*
   297 F.3d 959 (10th Cir.2002)..................................63
*United States v. Wade,*
   388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)..............35
*Valdez v. McKune,*
   266 F. App'x 735 (10th Cir. 2008)............................32
*Vreeland v. Zupan,*
   906 F.3d 866 (10th Cir. 2018)................................61
*Young v. State,*
   2000 OK CR 17, 12 P.3d 20...................................37

## Statutes

28 U.S.C. §2254(d)(1).........................................38, 60
28 U.S.C. § 2254(d)(2)...........................................38
22 O.S.2001, § 812.2..............................................4
28 U.S.C. § 2242.................................................66
28 U.S.C. § 2254 (e)(1)......................................44, 56, 60
28 U.S.C. § 2254(d) .........................................38, 46
28 U.S.C. § 2254(d)(1)(a).........................................30
28 U.S.C. § 2254(d)(2).......................................34, 44, 60
article II, §§6 and 20 of the Oklahoma Constitution......................4
Okla. Stat. tit. 12, § 2610........................................55
Okla. Stat. tit. 22, § 3001........................................58
U.S. Const. amends. V, XIV....................................33, 35

## Other Authorities

*A Call for Precedential Heads: Why the Supreme Court's Eyewitness Identification Jurisprudence Is Anachronistic and Out-Of-Step with Empirical Reality,*
  31 Law & Psychol. Rev. 21(2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
  *Arresting Development, Convictions of Innocent Youth,*
  62 Rutgers L. Rev. 879 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## INDEX OF ATTACHMENTS

Attachment 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . State District Court Order

Attachment 2 . . . . . . . . OCCA Order Affirming Denial of Post-Conviction Relief

Attachment 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-mail from Michael Lang

Attachment 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of Michael Lang

Attachment 5 . . . Transcription of January 8th and January 12th interviews

## CUSTODY INFORMATION AND PROCEDURAL HISTORY

### (As per LCvR 9.2 (a) and Form AO 241 (Rev. 06/13))

1. Antonio Garcia Ellis, ODOC # 408622, is currently in the custody in the Oklahoma Department of Corrections at the Oklahoma State Reformatory in Granite, Oklahoma and Warden William "Chris" Rankins.

2. Mr. Ellis was tried and convicted by a jury of first-degree felony murder in Oklahoma County Case No. CF-1999-218, for the January 6, 1999 shooting death of Christopher David Terry at the Vend-A-Wash car wash located near NW 50th and Ann Arbor in Oklahoma City.

3. A jury trial was held on May 21-June 1, 2001 before the Honorable Virgil K. Black. Mr. Ellis was represented by Michael S. "Mickey" Homsey and Terry McMillan.

4. Following his conviction, Mr. Ellis appealed his conviction to the Oklahoma Court of Criminal Appeals in appellate case number F-2001-924, and represented by Michael Morehead of the Oklahoma Inidgent Defense System. His conviction was affirmed by published opinion on September 5, 2003. *Ellis v. State*, 76 P.3d 1131 (Okl.Cr.2003). The grounds raised in his direct appeal were:

   1. Mr. Ellis's right to a speedy trial was violated in contravention of th article II, §§6 and 20 of the Oklahoma Constitution and the Sixth Amendment to the United States Constitution. Additionally, Mr. Ellis's statutory right to a hearing on his complaint was repeatedly denied in violation of 22 O.S.2001, § 812.2 and the Fourteenth Amendment to the United States Constitution;
   2. The State's failure to provide notice of its rebuttal witnesses deprived Mr. Ellis of his rights under the Sixth and Fourteenth Amendments to the Federal Constitution;
   3. Mr. Ellis's conviction must be reversed with instructions to dismiss because the evidence presented by the State was insufficient to prove his guilt beyond a reasonable doubt;
   4. Mr. Ellis received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article II, § 20 of the Oklahoma Constitution:
      a. Failure to call available witnesses, utilize available evidence, and/or adequately investigate to identify evidence;

1

       b. Failure to properly object to the State's alibi rebuttal witness.

5. Mr. Ellis did not seek a petition for certiorari in the United States Supreme Court.

6. Mr. Ellis filed a *pro se* first post-conviction application on March 27, 2017 challenging only the constitutionality of his life without parole sentence because he was a juvenile (17 years old) at the time of the homicide. As a result of that application, his sentence was modified to a life sentence on March 20, 2018.

7. On December 26, 2018, Mr. Ellis filed a *pro se* second post-conviction application in Oklahoma County District Court only arguing that the sentence modification he received was not an adequate remedy under *Miller v. Alabama* and requesting a new sentencing hearing. The State filed a response to that application on January 25, 2019.

8. After the development of the newly discovered evidence of factual innocence (Michael Lang's recantation) counsel for Mr. Ellis, the Oklahoma Innocence Project, filed Petitioner's Motion to Hold In Abeyance His Pending Second Post-Conviction Application and Leave to File An Amended Post-Conviction Application on November 1, 2019. With the agreement of the Oklahoma County District Attorney's Office, an agreed order was entered staying the post-conviction proceeding and allowing Petitioner time to amend his post-conviction application to include issues related to newly discovered evidence.

9. His Amended Second Application For Post-Conviction Relief was filed on July 6, 2020. In his amended second application for post-conviction relief Mr. Ellis raised the following:

    1. Michael Lang's complete recantation of his statements to police and his testimony requires vacating Mr. Ellis's conviction in the interest of justice;

    2. Michael Lang's recantation proving Mr. Ellis's conviction is based on a false accusation constitutes newly discovered evidence of factual innocence and requires Mr. Ellis's conviction to be vacated in the interest of justice.

    3. The procedure used to secure Michael Lang's identification of Antonio Ellis as the person who shot David Terry was

coercive, unnecessarily suggestive and violative of due process under the federal and state constitutions.

4. The use of coercive police questioning of Michael Lang, a juvenile, that resulted in his making a false accusation against Antonio Ellis violated Mr. Ellis's right to due process and a fair trial in violation of the federal and state constitutions;

5. The suppression of information relating to a photograph of Antonio Ellis being shown to Michael Lang prior to Lang picking Petitioner out of the live line-up violated *Brady v. Maryland* and its progeny in violation of Petitioner's due process right to a fair trial under the federal and state constitutions.

10.    The State's response to the post-conviction application was filed on October 7, 2020.

11.    A hearing was held before the Honorable Susan Stallings on February 2, 2021. At the conclusion of hearing the Court ordered the hearing transcript to be prepared at public expense and ordered the parties' proposed findings of fact and conclusions of law to be filed within sixty (60) days of the hearing. Both sides filed proposed findings of facts and conclusions of law on April 5, 2001.

12.    The district court issued an order denying post-conviction relief on May 3, 2021, adopting almost verbatim the State of Oklahoma's proposed findings of fact and conclusions of law. (Attachment 1)

13.    Mr. Ellis perfected a post-conviction appeal to the Oklahoma Court of Criminal Appeals on July 1, 2021. OCCA issued an Order Affirming Denial of Second Application for Post-Conviction Relief on March 15, 2022. (Attachment 2)

## STATEMENT OF FACTS

### A.    Statement of facts developed at trial.

Christopher David Terry went to the Vend-A-Coin carwash located near the intersection of Northwest 50th and Ann Arbor around 10:00 p.m. on January 6, 1999 to rinse of his Ford Explorer. At approximately 10:41 p.m. a 9-1-1 call was made from the pay phone in the car wash parking lot by a seventeen-year-

3

old boy named Michael Lang who reported he had heard shots and there was a man down. (Tr.III 513-515)(Tr.III 589-590)(State's exhibit 44)[1]

When Warr Acres Police Officer Scott Schatzer arrived at the car wash he observed Mr. Terry lying on the ground near his vehicle. (Tr.III 519) The vehicle appeared to have been recently washed and the doors were open. (Tr.III 520) At that time, Mr. Terry had a faint carotid pulse. (Tr.III 521) Shortly thereafter, the fire department arrived and life saving measures began. (Tr.III 522-524) Mr. Terry suffered a single shot that went through his hand and penetrated his chest. (Tr.) He was pronounced dead after being transported to the hospital. (Tr.III 526)

After a series of interviews with Mr. Lang, and the administration of a polygraph test on January 7th, Mr. Lang was taken back to his apartment complex to pick a suspect out of a live line-up that included Antonio Ellis who lived across the breezeway from Mr. Lang. After observing Mr. Ellis, his younger brother Timothy Brown, Jr., and Chris Gatlin, Mr. Lang identified Mr. Ellis as the person he saw at the crime scene. (Tr.V 1017-1018)

No physical evidence connecting a suspect to the crime scene was recovered during the crime scene investigation. Mr. Terry's wallet and keys were found inside the Explorer. (Tr. V 998) A pager he carried was never found. (Tr.IV 774)(Tr.V 1062) A search of Mr. Ellis's family's apartment and his car conducted the evening of January 7, 1999 did not produce any physical evidence connecting

---

[1] Trial transcripts volumes will be designated by Roman numeral of each volume. The preliminary hearing transcript is designated as P.Tr. The state post-conviction evidentiary hearing is designated as Hr.Tr.

Mr. Ellis to the crime or the crime scene.  (Tr.IV 804-807)

Based on Mr. Lang's identification, Mr. Ellis was arrested on a charge of first degree murder on January 7, 1999 after being identified by Mr. Lang. (Tr.V 1017) Mr. Lang was also held in jail for five (5) days as a suspect in Mr. Terry's killing. Ultimately, he was released, and charges were dropped.  Testimony at trial established that with the exception of Michael Lang, no evidence connected Mr. Ellis to Mr. Terry's killing.  (Tr.IV 815)

### B.  Michael Lang's Custodial Interviews.[2]

Michael Lang's trial testimony was very different than what he originally told investigators in the hours and days following the shooting.  Mr. Lang was detained at the car wash while he explained to officers that he heard a gunshot then came upon Mr. Terry laying on the ground by his car.  He was transported to the Warr Acres Police Department for further questioning in the hours following the shooting.  Lead Detective James Bauman testified at trial that his first interview of Michael Lang began around 1:00 a.m. on January 7th.  (Tr.V 998-999) That interview lasted "several hours." (Tr.V 999)  The interview was unrecorded.  However, at trial, Detective Bauman testified that during that interview Mr. Lang told detectives that he did not see anything. (Tr.V 1039)

Mr. Lang's second interview occurred around 11:45 a.m.-12:00 noon on January 7th.  (Tr.V 999) Mr. Lang's father dropped him off at the Warr Acres Police Department and signed a consent for Mr. Lang to take a polygraph test.

---

[2] A DVD containing video from Mr. Lang's January 8th and January 12th interrogations was admitted at the state post-conviction hearing as Petitioner's exhibit 1.  A transcript of both interrogations is attached hereto as Attachment 5 for the convenience of the Court.

He was transported, alone, to the Oklahoma County Jail where OHP Officer Gary Thornberry administered the polygraph test and did a post-test interview with Mr. Lang. During the post-test interview Mr. Lang was told that he failed the polygraph test. Officer Thornberry advised Detectives Bauman and Wilkerson that Mr. Lang implicated "the younger brother of Antonio" during the post-polygraph interview that occurred on the afternoon of January 7th. (P.Tr. 119) That statement is also unrecorded. According to Detective Bauman's preliminary hearing testimony, Mr. Lang was confused about which brother he was talking about. (P.Tr.119)

Following the polygraph test Mr. Lang was taken back to the Warr Acres Police Department. On the return trip he was taken back by the car wash at which time he was told to "tell the truth." (P.Tr. 120) According to Bauman, Mr. Lang came up with another story saying that he saw Antonio Ellis at the scene and that he was standing "close" to Mr. Terry when he shot him. (P.Tr. 121) The record at trial is unclear how Mr. Lang quit being confused about who Mr. Ellis was as this conversation was unrecorded.

As a result of Detective Bauman developing Antonio Ellis as a suspect, officers from the Warr Acres Police Department and the Oklahoma City Police Department went to the apartment he lived in with his family at 5518 Willow Cliff Road. (Tr.V 1008) His apartment was directly across from Michael Lang's apartment. (Tr.V 1009) Officers surrounded the apartment and knocked on the door with guns drawn. (Tr.V 1010) After law enforcement entered the apartment, Mr. Ellis was handcuffed. (Tr.VII 1415) Mr. Gatlin and Mr. Brown were not

handcuffed. (Tr.VII 1406) A live show-up was then conducted where Mr. Ellis, Mr. Brown and Mr. Gatlin were lined up outside the apartment where Mr. Lang observed them, illuminated by a flashlight since it was after dark, and picked out Mr. Ellis as the person he saw at the crime scene. (Tr.V 1016-1017) During the line-up Mr. Ellis was wearing a blue flannel jacket, a blue baseball cap and Dickies. At trial, Chris Gatlin, the white boy in the line-up, testified that Mr. Ellis was the only one of the three who was handcuffed that evening.

Two of Mr. Lang's interviews are recorded. Those recordings reveal that during the course of a short interview on January 8th and a much longer interview from the Oklahoma County Jail on January 12th, Mr. Lang's story changed radically. The detectives used interrogation techniques such as accusations, threats, minimization and evidence-based tactics to tailor Mr. Lang's story to their theory of the case. The interviews are also rife with incidents of the detectives contaminating Mr. Lang's story.

Examples of contamination include during the January 8th interview, Detective Bauman modified Mr. Lang's recollection of the color of Mr. Terry's vehicle from "tan" to "light tan." (Int.Tr. 6) Detective Bauman asked Mr. Lang how far away he was from the shooting then himself states "50 feet?" (Int.Tr. 7) Additionally, when Mr. Lang was asked to describe the shooter's clothing he described what Mr. Ellis was wearing during the line-up and his subsequent arrest suggesting the line-up contaminated his description of the clothing. (Int.Tr. 11-12, 25-26) Detective Bauman also had to straighten out Mr. Lang's confusion about which brother, Antonio Ellis or Timothy Brown, Jr., he was

implicating as the shooter. (Int.Tr. 16-21) Throughout the interview Mr. Lang never used Mr. Ellis's last name in identifying him.

The January 12th interview reveals more use of coercive and contaminating interrogation techniques. For example, Mr. Lang initially said the shooter approached Mr. Terry and wanted his money. However, during the January 12th interview detectives suggested that Mr. Lang and Mr. Ellis "...were out looking to jack a car." (Int.Tr. 39) In the next rendition of that part of the story Mr. Lang said that the shooter said "Where's your shit at" and was looking for some keys. Detective Bauman follows up by asking "He was going to take the truck?" to which Mr. Lang responded "Probably, I guess that's what he was..." Detective Bauman's follow up statement solidified the carjacking theory: "Look at me. Don't guess. When you said – you said you guys were at the corner and you saw the truck, y'all both talked about the truck, it was a nice truck, did he tell you he was going to car –he was going to take the truck?" When Lang told the story again he said that before Mr. Terry was shot, Mr. Ellis said "Where your keys at?" (Int.Tr. 98-99)

Similarly, Mr. Lang changed his story about where he was standing during the shooting. During the January 8th interview Mr. Lang said he was south of 50th Street on Ann Arbor. (Int.Tr. 8) During the January 12th interview, when he said he had not crossed 50th yet when the shooting happened, Detective Bauman became irritated and stated "Now this is the same story you've been telling me." When Mr. Lang continued Detective Bauman told him, "Michael, you're not telling me anything different," to which Mr. Lang responded, "No, I

shouldn't be, no, because that's what happened." Detective Bauman then explained to Mr. Lang that he had to be someplace other than across the street when the shooting happened at which point Mr. Lang said he was on the same side of the street as the victim. (Int.Tr. 76-77) Ultimately Lang adopted that statement. (Int.Tr. 82-83) He was subsequently assured that being on the same side of the street as the car wash wasn't going to hurt him. (Int.Tr. 122) He was also told that by placing himself on the side of the street as the car wash "you give us more to help our case than being on this side of the street where you can't see or hear shit." (Int.Tr. 123)

Much like the January 8th interview, during the January 12th interview Mr. Lang did not name Antonio Ellis during his interview. When he said he saw "dude" walking down the street, Detective Bauman injected the name "Antonio." (Int.Tr. 69) Lang's response was, "Whatever his name is." (Int.Tr. 70) When pressed by Detective Bauman Lang simply said "the guy who shot him." Detective Bauman asked if he meant the guy Mr. Lang identified to which Lang responded in the affirmative.

On numerous occasions during the January 12th interview, the detectives accused Mr. Lang of lying and needing to come clean. (Int.Tr. 33, 35, 37-38, 45, 46, 49, 50, 56, 79) In fact, when Mr. Lang said he wanted to talk to a lawyer he was told multiple times that means he is lying. (Int.Tr. 45-46, 56) He was even told that the jury was going to think he was "lying his ass off" about how well (or not well) he knew Mr. Ellis. (Int.Tr. 114-116) Detectives also threatened Lang with not getting help from the District Attorney's Office if they don't believe what

he is telling them.  (Int.Tr. 52-53, 79, 122-123)

The January 12th interview concluded with the detectives nailing down that Mr. Lang was on the north side of 50th Street when the shooting occurred, the shooter was standing ten (10) feet away from Mr. Terry when he was shot, and that the shooter had the gun in his left hand when he ran to the park. (Int.Tr. 124-126)

### C. Lang's Testimony at Trial.

At trial, Mr. Lang testified that he lived at the Willow Cliff Apartments across from Antonio Ellis. (Tr.III 561) He lived there for about a month prior to January 6, 1999.  He and Mr. Ellis went to different schools.  He testified that they did not speak when they saw each other, they had never argued about anything, and they had never been to each other's apartments. (Tr.III 562) Mr. Lang testified that on the evening of January 6, 1999 he saw Mr. Ellis in the area of Northwest 47th and Ann Arbor as Mr. Lang was walking North on Ann Arbor on his way home.  (Tr.III 563) The two walked north together to Northwest 50th Street.  (Tr.III 564) According to Lang, as the two walked north, Mr. Ellis asked for a black and mild cigar but since Lang didn't have another one he gave Mr. Ellis a hit off the one he was smoking.  (Tr.III 565-566) As they approached Northwest 50th Mr. Ellis directed Mr. Lang's attention to a car at the car wash across the street where he saw someone vacuuming his car.  (Tr.III 566) As the two walked across the intersection Mr. Ellis sped up and said he was "going to get him." (Tr.III 568) Mr. Lang told the jury that heard Mr. Ellis, yelling, ask for the keys repeatedly, then shot the man.  (Tr.III 568) He never heard Mr. Terry

say anything.  Mr. Lang testified that he heard Mr. Ellis say "Give me the keys. Give me the keys. Give me the keys" while Lang was still crossing the intersection.  (Tr.III 569)

Mr. Lang said he could see Mr. Ellis point the gun at the man standing at the vacuum then heard the gunshot.  He testified he saw the man put his arm up to block himself from the bullet.  (Tr.III 570) After the shooting he saw Mr. Ellis quickly search the body then run off.  (Tr.III 571) He did not see him take anything from the body.  Mr. Lang was standing by the telephone from which he made the 9-1-1 call when he observed everything.   (Tr.III 572, 576) Mr. Ellis ran east, jumped over a ditch, went in between two wire gates, and ran to the park. After he got himself together, Mr. Lang called 9-1-1.  (Tr.III 573) He told them he had heard a gunshot and had just gotten there to see a man down.  (Tr.III 573)(State's exhibit 44) He did not see anyone else in the vicinity other than Mr. Terry.  (Tr.III 573)

Mr. Lang described the gun as mostly black and possibly having a clip. (Tr.III 577) He saw sparks come out of the gun.  He had not seen the gun on Mr. Ellis prior to his shooting the victim.  (Tr.III 578) While waiting for emergency vehicles Mr. Lang asked Mr. Terry if he was okay but did not get a response. (Tr.III 580)

When asked about his interviews Mr. Lang was asked "...do you remember in the interviews you gave, you gave some statements that weren't—weren't true at the time," to which he responded "Yes, I do." Mr. Lang explained that he gave those "false statements" because he didn't want to get involved and he didn't

want anything to happen to he or his family. (Tr.III 581) He also claimed he did not want it to interfere with his juvenile probation. (Tr.III 581-582) Upon direct questioning by the State, Mr. Lang acknowledged that he initially told police that he only heard the gunshot then discovered the victim after crossing the street but said none of that was true. (Tr.III 582) He reiterated, again upon direct questioning, that he gave varying statements because he didn't want to get involved. (Tr.III 591) When asked upon direct questioning to "...tell the Ladies and Gentlemen of the Jury whether or not you're telling the truth today," He stated "Yes, I am telling the truth." (Tr.III 592)

To prepare for his trial testimony Mr. Lang reviewed his preliminary hearing testimony, police reports, and videotaped interviews in the District Attorney's Office. (Tr.III 597) On cross-examination, Mr. Lang testified that he did not know Mr. Ellis. (Tr.III 593) He had never had any contact with Mr. Ellis prior to January 6th. (Tr.III 594) He did know Mr. Ellis's younger brother Timothy but did not know his name at the time of the homicide. He acknowledged that he gave multiple inconsistent stories to the detectives during his interview as well as at preliminary hearing. (Tr.III 597-602) He could not recall when the first time was that he described the clothes Mr. Ellis was suppose to be wearing on the night of the homicide. (Tr.III 604) He did, however acknowledge that despite his trial testimony that he had never seen the ballcap Mr. Ellis was allegedly wearing on the night of the homicide, he testified at preliminary hearing that he always wore that hat." (Tr.III 604) When pressed on whether Mr. Terry was vacuuming the car or cleaning the windshield, Mr. Lang

testified that he was sure Mr. Terry was vacuuming the car and stated for the first time he heard the vacuum but could not explain how the hose was hanging on the vacuum instead of in the car when the police arrived. (Tr.III 606-607) Additionally, Mr. Terry was found on the other side of the car from the vacuums.

When asked about the ride from the Oklahoma County Jail back to the Warr Acres Police Department, Mr. Lang testified that that is when he told the detectives "parts of the truth." (Tr.III 610) Part of that truth was that he was on the same side of the street as the car wash when the shooting happened. He also stood by his estimation that the shooter was standing approximately 10 feet away from Mr. Terry when he shot him. (Tr.III 611-613) Additionally, he testified that he did not see Mr. Terry get shot in the arm, but the detectives told him. (Tr.III 617) He also did not see anyone running back across the street or see or hear a car accelerating out of the car wash parking lot. (Tr.III 619-620) Mr. Lang stated that during the interviews he was threatened by the detectives with being charged with murder and that he was going to get the death penalty. (Tr.III 619)

**D. Other Relevant Witness Testimony at Trial.**

Mr. Ellis's friend Justin Ward was interviewed by Detective Bauman in April and May 1999. He was sixteen (16) years old at the time and in special education classes. (Tr. IV p. 835, 865) Initially, Mr. Ward said that he was at work at Coit's Drive-in the night of the shooting. He told Detective Bauman that Mr. Ellis told him he admitted to shooting Mr. Terry at school the day after the homicide. However, Mr. Ward recanted his statement during trial. Mr. Ward testified that in an interview at the police department, he was confronted with

information that he had not been at work on the night of the shooting. Detective Bauman told Ward he would go to jail for a long time if he "did not come clean." (Tr. IV 847) Bauman also told him he had been identified as being at the scene of the homicide.   (Tr. IV 871-872) That threat scared Ward "to death." (Tr. IV 850) Ward testified he just wanted to go home but they told him he couldn't go home until he told them a story. (Tr. IV 873) As a result of that fear, Ward told Bauman that Ellis shot Mr. Terry for his Explorer. (Tr. IV 851-853)(Court's Ex. 1)  Ward also told police that Ellis told him that Lang was there. (Tr. IV 851) Additionally, Ward told the police that approximately one month before the shooting Mr. Ellis told him he needed a gun to protect himself.  (Tr. IV 861)

Prior to trial Ward revealed to Assistant District Attorney Shannon Henson that he lied about Mr. Ellis saying he had shot Mr. Terry and about Ellis looking for a gun a month before the homicide.  (Tr. IV 861-863) He tried to correct his story prior to preliminary hearing but one of the assistant district attorneys on the case at that point, and Detective Bauman, told him he would go to jail for perjury.  (Tr. IV 876) At trial, Ward testified that he was not at school with Mr. Ellis the day after the homicide because he had been suspended; a fact Bauman never checked.   (Tr. IV 863-864) He also testified that he and Ellis had talked about getting a gun for protection, but Ellis wasn't serious about it.  (Tr. IV 875) Despite telling Detective Bauman he had seen Ellis get in fights, that was not true either.  (Tr. IV 881) Finally, Ward testified at trial that Mr. Ellis was not in a gang and statements he made saying he was were not true.  (Tr. IV 883)

Ward was willing to implicate one of his best friends in a homicide after

14

being threatened with going to jail himself if he did not tell the police something. When he first tried to admit to a prosecutor and the lead homicide detective that he was not telling the truth he was further threatened with jail time for perjury. Fortunately for Ward, he was able to consult with an attorney who was present during his trial testimony.  Mr. Lang never had his own attorney despite being treated as a suspect then being charged along with Mr. Ellis.

Don Lowry lived across the street from the Vend-A-Car carwash.  (Tr. V 1092) Mr. Lowry heard what he believed what was a gunshot while he watched the 10:00 p.m. news on the night of January 6, 1999.  Shortly thereafter he heard the tire squeal of a car taking off fast.  (Tr. V 1093) He then heard emergency vehicles and went to the carwash to see what was happening.  He reported what he had heard the police that night.  (Tr. V 1094-1095) Michael Lang was asked if he heard a car speed away at trial but denied hearing or seeing one.  (Tr.III 619-620)

Witness Jason Doty reported that he was driving westbound on NW 50th Street when he observed a man on the ground in the parking lot of the carwash and a black male standing in the parking lot.  He reported seeing a dark colored Oldsmobile or Monte Carlo, with a white male driver, pull into the convenience store between the car wash and the Willow Cliff Apartments.  (Court's Ex. 4) Again, Michael Lang purported to not have seen another car in the area after he found Mr. Terry at the carwash.  (Tr.III 620)

Oklahoma City Police Department Firearm and toolmark examiner Gregory Karim testified that based on the casing (State's exhibit 49) and

projectile (State's exhibit 50) collecting in this case, he determined the bullet was likely fired from a Hi-Point or a Stallard firearm.  (Tr. V 969-970)(State's exhibit 65)  Mr. Karim estimated that if a Hi-Point or Stallard semi-automatic was used, which both have a four (4) inch barrel, that the gun must have been eighteen (18) inches away from Mr. Terry when it was fired. (Tr.V 984-985) Because he did not have the actual gun or the actual ammunition he explained that there is a plus or minus six (6) inches in his estimate meaning the gun was likely twelve (12) to (24) inches away from Mr. Terry when he was shot.  (Tr.V 986)

### E. Antonio Ellis's alibi.

Multiple witnesses testified in support of Mr. Ellis's alibi defense.  Mr. Ellis could not have committed the crime because he was on the telephone with his girlfriend, Malorie Simms, between 10:15 p.m. and 10:45 p.m. on the night of the homicide.  Miss. Simms, who lived in a different building in the same apartment complex, testified that on the night of the shooting she met Mr. Ellis outside of her apartment around 9:30 p.m.  After talking for approximately ten (10) minutes, Mr. Ellis left and Miss Simms took her dog on a walk.  (Tr.VI 1306) After returning to her apartment, Miss Simms received a call from Mr. Ellis at 10:15 p.m. (Tr.VI 1307) She could recall the specific time because she looked at the Caller ID, saw that it was Mr. Ellis, and noticed the time.  The two teenagers talked until approximately 10:45 at which time Miss Simms's mother yelled from the other room that she needed to get off the phone because she was not allowed to use the phone after 10:30 p.m.  (Tr.VI 1314, 1316)

Melanie Simms, Malory's mother, confirmed Malory's recollection of the

evening.  She recalled that Malory took the dog on a walk around 9:30 p.m. (Tr.VI 1372-1377) After going to bed around 10:00 p.m. she recalled hearing the telephone ring and looked at the clock because the late call irritated her.  She remembered yelling through the wall for Mallory to get off the phone but was not sure how much longer she was actually on the phone.  (Tr.VI 1395)

### F. Michael Lang's Recantation.

On September 9, 2019, Mr. Lang sent an e-mail to the Innocence Network stating:

> In 1999 there was an incident where a preacher was shot! It had happened on my way home from playing basketball when I was 17 years old.  The scene took place at a carwash.  There was a man laying on the ground when I walked up to the scene! I called out to him to make sure he was okay he did not respond!   Immediately I called the police and stay there at the scene for them to arrive! I answered all questions and still I was accused! Being scared they asked me who I thought done it I gave a name they provided for me! He's in that name I picked him out in a lineup he was also 17 his name is Antonio Ellis! Mr. Ellis was ultimately convicted of this crime a crime he didn't commit! We are both victims! I was coached to testify + 2000 and it was very unjust the way I was coached to do it! Almost rehearsing the things they wanted me to convict Antonio Ellis! Please it's been a long time help me free Antonio Ellis it's time! Again, my name is Michael Lang and I need your help!

(Attachment 3) Mr. Lang's e-mail was forwarded to the Oklahoma Innocence Project who subsequently contacted and interviewed Mr. Lang.  As a result of the subsequent contacts, Mr. Lang signed an affidavit on October 29, 2019 recanting his trial testimony and confirming what he originally told 9-1-1 and police; that he was across the street from the car wash when he heard a gunshot then when he crossed the street, he saw Mr. Terry on the ground by his car and called 9-1-1.  (Attachment 4)

Mr. Lang testified at the evidentiary hearing and recanted his trial

testimony under oath before the Court. He testified that his reason for coming forward was because of years of torturing himself over what happened. (Hr.Tr. 58) He stated "The truth wasn't out there, and there was a man who didn't do anything in jail for life because of something I did. I wanted to set it straight." (Hr.Tr. 58) He stated that prior to sending the initial e-mail he had no contact with Mr. Ellis, anyone from his family and nobody from the Innocence Project or the Oklahoma Innocence Project. (Hr.Tr. 55-56, 58)

At the hearing, Mr. Lang recalled that on the night of January 6, 1999, he had been playing basketball at a church. (Hr.Tr. 20) He remembered stopping at a friend's house to get a haircut. He stopped at a 7-11, then at Arby's or Taco Bell to get a job application. Then he walked north on Ann Arbor. He heard a gunshot as he approached Northwest 50th Street. (Hr.Tr. 21) He described the "most traumatic thing" as seeing a man on the ground. All of the doors of his car were open and he was just "laying there." (Hr.Tr. 21-22) He called out to him but there was no response. (Hr.Tr. 22, 23) He went back to the payphone in the parking lot and called the police. At the evidentiary hearing he could not remember what he told the 9-1-1 operator.

After calling 9-1-1 Mr. Lang waited by the pay phone under emergency personnel arrived. (Hr.Tr. 23) He could not remember if he talked to anyone at the scene but did recall being taken to the police station for questioning. (Hr.Tr. 24) His recollection becomes "fuzzy" after that point. He remembered being interviewed until early the next morning. (Hr.Tr. 27) The questioning began as if he was a witness but then shifted and he felt like he was being treated as a

suspect and started getting worried. (Hr.Tr. 27) On the first night the information he gave to police was consistent with his 9-1-1 report and what he testified at the evidentiary hearing. (Hr.Tr. 28)

Mr. Lang recalled the topic of a polygraph coming up in his first interview with police but could not remember who brought it up. (Hr.Tr. 28) He agreed to take a polygraph because he was told they are foolproof so since he was telling the truth he thought it would be okay. (Hr.Tr. 28-29) In the first interview he also recalled becoming emotion because the detectives were being "pretty aggressive" about their line of questioning. (Hr.Tr. 30) He testified that "A couple of times, I thought I was going to get the needle because they told me so." Mr. Lang recalled that by the time his father came to get him he was "really exhausted and tired" and emotionally drained. (Hr.Tr. 31)

Mr. Lang could not remember exactly when he was given a polygraph test or where the polygraph occurred. (Hr.Tr. 32-33) He could recall being hooked up to the polygraph machine and taking the test. (Hr.Tr. 33) Following the polygraph he was told that he failed the test and was being deceptive. (Hr.Tr. 34) That worried him. After the police made him confident about the reliability of the polygraph, he thought he was going to jail for life for something he didn't do. (Hr.Tr. 34) Mr. Lang testified that at that point he panicked and had to recant the truth. (Hr.Tr. 35) He stated he knew he had to give them a story that would get him out of it. On cross-examination Mr. Lang explained that detectives would ask "if this and this" and he would answer, "'Yeah,' as long as it collaborated with what they think had happened." (Hr.Tr. 70) He further explained that he

was telling the detectives what he thought they wanted him to say. At one point on cross-examination he observed, "And I guess they were just feeding me information." (Hr.Tr. 71)

Mr. Lang recalled that sometime after the polygraph he was taken to the apartment complex in order to do an identification. (Hr.Tr. 37) By then he had told the police Antonio Ellis was the one who shot Mr. Terry though he maintains that they suggested that to him. (Hr.Tr. 38) He testified that after he flunked the polygraph they suggested Mr. Ellis as he was "fixing my story based off the suff they were giving me." At the time he did not know Mr. Ellis's name and did not know who Antonio Ellis was. (Hr.Tr. 38) They asked about his neighbor and eventually gave him Mr. Ellis's name. (Hr.Tr. 39) They also showed him a photograph of Mr. Ellis. (Hr.Tr. 39-40) On cross-examination he elaborated and said they showed him a single photograph of Mr. Ellis, then a sheet of paper with a couple of suspects. (Hr.Tr. 71)

Mr. Lang recalled that when they went to Willow Cliff Apartments they brought "some guys in the apartment" out which included black and white males. He stayed in the back of the police car and picked out Antonio Ellis even though he did not see him shoot Mr. Terry. (Hr.Tr. 41-42) He testified that he told the police that lie to save himself. (Hr.Tr. 42) His selection was confirmed by the police when he was told "Yes, that's him." On cross-examination, Mr. Lang mentioned that there was also questioning about Mr. Ellis's car even though, apparently, they identified his car incorrectly. (Hr.Tr. 73)

Mr. Lang cannot remember the specifics of other interviews that followed

his identification of Mr. Ellis. He could recall changing his story to say that he was on the north side of 50th Street when the shooting occurred. (Hr.Tr. 47) He explained that he made that change "to fit their description of what they thought had happened so that, again, I could get off the hook with the whole thing." (Hr.Tr. 47)

In explaining why, he continued to lie even after he wasn't charged, Mr. Lang explained that he was worried that if he recanted his story they would look at him as a suspect again. (Hr.Tr. 52) Mr. Lang emphatically testified that his trial testimony identifying Antonio Ellis as the shooter was untrue. (Hr.Tr. 52) Like he told the police on the night of the homicide he did not see who shot Mr. Terry. (Hr.Tr. 52) His testimony was the result of the interviews that occurred following the homicide. (Hr.Tr. 52-53)

Following his contact with the Innocence Project and signing an affidavit relating to his recantation, Mr. Ellis gave an interview to the Oklahoma County District Attorney's Office. In order to do so, Mr. Lang had to surrender himself to clear a warrant that was outstanding with the Cleveland County Mental Health Court program. (Hr.Tr. 62) While in the Cleveland County Jail Mr. Ellis told his story to the Oklahoma County prosecutors and again, recanted his trial testimony as it related to his false testimony. (Hr.Tr. 62-63)

Mr. Lang was asked on cross-examination about his mental health history. He testified that he received treatment for schizophrenia in 2015 when he believed he was demonically possessed. (Hr.Tr. 84) Because his behavior was scaring his wife and him, he went to the hospital. (Hr.Tr. 85) Because of that

diagnosis he receives disability.  However, he does not require medication.
(Hr.Tr.86) Mr. Lang also described having spiritual attachments that oppress
him by playing mental games and interfering with his telepathy.  (Hr.Tr. 87-88,
90) However, he testified that since he is so in touch with God he doesn't really
worry a whole lot, or fear a whole lot.  (Hr.Tr.88) The attachments, that he also
thinks of as hexes, put spirits on him to make people think things about him.
(Hr.Tr. 91) Mr. Lang indicated at the hearing that he learned of these things in
2017 when he was involved in a church in Florida.  (Hr.Tr. 92) Mr. Lang denied
that anything about his spiritual beliefs impacted his recantation except his
belief in the Holy Spirit.  (Hr.Tr. 94)

Mr. Lang was also cross-examined about previous methamphetamine use
and openly admitted he had used it in the past.  (Hr.Tr. 93) He also admitted
having prior felony convictions for domestic violence, using a forged instrument,
and burglary in the third degree.  (Hr.Tr. 93) Those crimes are why he is in the
Cleveland County Mental Health Court program.

**F. Other Witnesses at the Evidentiary Hearing.**

Investigator Brenda McCray testified about her role in interviewing and
securing an affidavit from Michael Lang on behalf of the Oklahoma Innocence
Project. (Hr.Tr. 103) Based on her review of the case Ms. McCray informed the
Court that no forensic evidence was admitted at trial that tied Mr. Ellis to the
murder.  (Hr.Tr. 108-109) Ms. McCray also summarized the timeline of Mr.
Lang's contacts with law enforcement in relation to the investigation in this case.
In total, Mr. Lang had contact and/or was interviewed by law enforcement at

least eight (8) times.  (Hr.Tr. 110-111)

Ms. McCray described responding to Mr. Lang's original e-mail to the Innocence Project on September 9, 2019. (Petitioner's exhibit 8) Ms. McCray, along with Mr. Ellis's counsel, met with Mr. Lang on September 14, 2019 for an interview that lasted approximately one and a half hours.  (Hr.Tr. 112) At the time of that interview Mr. Lang was oriented to time and place and did not appear to be delusional.  (Hr.Tr. 114) Additionally, he responded appropriately to questions.  (Hr.Tr. 114-115) He was aware of why he was being contacted and understood the significance of his recantation.  (Hr.Tr. 115) Ms. McCray testified that there was never a time that she felt like Mr. Lang was delusional or did not understand what he was doing and the information he provided seemed to be reality based.  (Hr.Tr. 119-120)

At the time that he signed his affidavit Mr. Lang was in the Cleveland County Jail.  The affidavit had been prepared for him but he reviewed the affidavit before signing it asking questions and making comments about it. (Hr.Tr. 115-116) One addition was made to the affidavit in his presence which was to add the notary declaration. He made no further changes to the affidavit before he signed it.  (Hr.Tr. 116)

Following the signing of the affidavit, Ms. McCray lost touch with Mr. Lang as he had become homeless after being released from jail. (Hr.Tr. 117) Eventually he got back into touch and another meeting was arranged.  During that meeting arrangements were made for Mr. Lang to do an interview with the Oklahoma County District Attorney's Office.   (Hr.Tr. 117-118) Prior to the tentative

23

interview date it was discovered that Mr. Lang had an active warrant in Cleveland County for failure to report as necessary to Mental Health Court. (Hr.Tr. 118) Mr. Lang surrendered himself and served a jail sanction to clear the warrant. It was during that period in the Cleveland County Jail that the prosecutors were able to interview him and hear his recantation firsthand. (Hr.Tr. 119)

Trial counsel Terry McMillan testified that he joined Mr. Ellis's trial team after the preliminary hearing. (Hr.Tr. 130) He recalled that Michael Lang identified Mr. Ellis at a live line-up at their apartment complex. (Hr.Tr. 131) He does not recall ever having information that Mr. Lang had been shown a photograph of Antonio Ellis prior the line-up. (Hr.Tr. 131) He also did not recall any such photograph being turn over in pre-trial discovery. As far as he recalled there was no open file policy in this case so they would have had to have gotten it in discovery. (Hr.Tr. 132) If they had information that Mr. Lang had been shown a photograph prior to the line-up, Mr. McMillan testified that they would have filed a motion to exclude or a motion in limine. He recalled they filed "everything under the sun" so if that had come up he was sure they would have challenged it. (Hr.Tr. 132)

Lead counsel Michael S. "Mickey" Homsey also testified at the hearing. Mr. Homsey testified that he became involved in representing Mr. Ellis within a week of his arrest. (Hr.Tr. 143) He recalled that Mr. Lang had been taken to the apartment complex for a live line-up where he identified Antonio Ellis. (Hr.Tr. 144) Mr. Homsey testified that he did not have information that Michael Lang had been shown a photograph of Mr. Ellis prior to his picking him out of the line-

up.. (Hr.Tr. 145) If he had that information, he would have filed something and likely tried to have the identification suppressed. (Hr.Tr. 145) He did not recall there being an open file policy in this case and having to ask for discovery. (Hr.Tr. 146)

Retired Warr Acres Detective Jim Bauman testified for Respondent. Mr. Bauman testified that he was the lead detective on the investigation into Mr. Terry's death. (Hr.Tr. 157) The only interview with Michael Lang Mr. Bauman could recall was on the night of the homicide. (Hr.Tr. 158) It was during that interview in the late hours of January 6th and early morning hours of January 7th that Mr. Bauman recalled Michael Lang naming Antonio Ellis. (Hr.Tr. 158) Mr. Bauman testified he was unaware of Antonio Ellis prior to Mr. Lang identifying him. (Hr.Tr. 158-159) The first time Mr. Bauman became aware of what Mr. Ellis looked like was the day after the murder when they arrested him. Mr. Bauman denied having any photographs of Mr. Ellis and testified that "to his knowledge" no Warr Acres detective showed Michael Lang a photograph of Mr. Ellis. (Hr.Tr. 159) He also denied showing Mr. Lang a photograph of Mr. Ellis's car. (Hr.Tr. 160)

On cross-examination Mr. Bauman testified that he did not review any information to prepare for his testimony. Upon being shown a copy of his police report from the first interview with Mr. Lang he acknowledged that the report does not reflect that Mr. Lang identified Mr. Ellis during that interview but maintained that Mr. Lang identified Mr. Ellis that night. (Hr.Tr. 166) Otherwise, Mr. Bauman could not remember how many times he interviewed Mr. Lang but

conceded there could have been other conversations. (Hr.Tr. 174-175) Because he could not remember all of the conversations he could not definitely say if a photograph had been shown to Michael Lang.

## ARGUMENT AND AUTHORITY

### I.

### INTRODUCTION

Antonio Ellis's case is an extraordinary case of innocence. His conviction for a murder he was accused of committing at the age of seventeen (17) is based entirely on the testimony of another seventeen-year-old, Michael Lang. Prior to naming Mr. Ellis as the person who shot Christopher Terry at a car wash in Oklahoma City around 9:30 p.m. on January 6, 1999, Mr. Lang repeatedly told his interrogators that he did not see who shot Mr. Terry but only heard the gunshots then discovered Mr. Terry lying in the parking lot of the carwash. Only after being accused as a suspect and being threatened with the death penalty, told he flunked a polygraph and being driven by the crime scene did he name Antonio Ellis as a shooter. He now says that identification was coerced thereby calling into serious question the sole foundation of Mr. Ellis's conviction. Habeas corpus is the last judicial inquiry into the validity of a criminal conviction and serves as "a bulwark against convictions that violate fundamental fairness." *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). This is such a case.

**II.**

**TIMELINESS OF PETITION, EXAUSTION OF STATE REMEDIES, AND REQUEST FOR TRANSMISSION OF STATE COURT RECORD.**

### A. Timeliness of petition.

Mr. Ellis'ss petition is timely under the one-year limitation of the AEDPA. 28 U.S.C. § 2254(d)(1)(a). All of the claims raised herein relate to newly discovered evidence. The State of Oklahoma conceded that the evidence was newly discovered and the state court found that the evidence was newly discovered at the time Mr. Ellis first raised his claim in state court. (Attachment 1, p. 7)

Mr. Lang first reached out of the Innocence Project via e-mail on September 9, 2019. (Hr.Tr. 111)(Attachment 3) After the e-mail was forwarded to the Oklahoma Innocence Project, counsel for Mr. Ellis and an investigator met with Mr. Lang on September 14, 2019. At that time Mr. Lang advised Mr. Ellis's team the story that he ultimately testified to at the state evidentiary hearing. (Hr.Tr. 112-113) Ultimately, an affidavit was signed by Mr. Lang on October 29, 2019. Because Mr. Ellis had a *pro se* post-conviction application pending in the District Court of Oklahoma County at the time the new evidence was discovered, counsel filed a motion to stay the proceedings and asked for additional time to further investigate the new evidence. Ultimately, an Amended Second Application for Post-Conviction Relief was filed on July 6, 2020. The post-conviction case remained pending in the district court, then on appeal, until the Oklahoma Court of Criminal Appeals issued an order affirming the denial of relief on March 15, 2022.

27

301 days passed between the date Michael Lang sent his e-mail to the Innocence Project until the filing of the Amended Second Application for Post-Conviction Relief was filed. That left 64 days for Mr. Ellis to file his habeas petition within the one-year limitation. The date of filing this instrument is day 365 and therefore, the petition is timely. Alternatively, if the Court finds that the petition is untimely, Mr. Ellis asserts that his actual innocence excuses his untimely filing under *McGuiggin v. Perkins*, 569 U.S. 383 (2013).

### B. Exhaustion of state remedies.

All of the grounds for relief presented herein was raised in the Amended Second Application for Post-Conviction Relief and in the appeal to the Oklahoma Court of Criminal Appeals following the denial of post-conviction relief with the exception of the cumulative error claim. Under Oklahoma Court of Criminal Appeals Rule 5.2, post-conviction appeal briefs are limited to thirty (30) pages. Counsel for Petitioner filed a motion to file a fifty (50) page brief and tendered a fifty (50) page brief that did not include a cumulative error claim. The oversized brief was accepted by the court for filing just before post-conviction relief was granted. The page limitations of the Oklahoma Court of Criminal Appeals made the exhaustion of the cumulative error claim impossible.

Petitioner submits that his failure to raise that claim in the state court should be excused by his well-founded claim of factual innocence in accordance with *Schlup v. Delo*, 513 U.S. 298 (1995).

Alternatively, Petitioner submits that returning to state court to exhaust the cumulative error claim would be futile, and therefore, falls within an

exception to the exhaustion doctrine.  *Bear v. Boone*, 173 F.3d 782, 784 (10th Cir. 1999).  The state court did not decide the claims that serve as the basis of the cumulative error claim raised herein. (Attachment 1, p. 7) Therefore, a remand would only result in the claim being procedurally barred.

If the Court finds that the cumulative error claim does not fall under either of the above exceptions to exhaustion, then Petitioner asks for the Court to stay and habeas proceedings and allow him to return to state court to exhaust the cumulative error claim pursuant to *Rhines v. Webber*, 544 U.S. 269 (2005).

### C. Transmission of state court record.

Petitioner requests that Respondent or some other appropriate authority, such as the state court, transmit the entirety of the state court record to this Court.

### III.

**THE USE OF COERCIVE POLICE QUESTIONING OF MICHAEL LANG, A JUVENILE, THAT RESULTED IN HIS MAKING A FALSE ACCUSATION AGAINST ANTONIO ELLIS VIOLATED MR. ELLIS'S RIGHT TO DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT.**

The Due Process Clause creates a check on the admission of eyewitness identification when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.  *Perry v. New Hampshire,* 565 U.S. 228, 232 (2012).  Such evidence becomes inadmissible when "evidence is so extremely unfair that it's admission violates fundamental conceptions of justice."  *Id.* quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990).  In such cases courts have the power to determine "whether the action

complained of ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112 (1935). Due process is offended when a conviction is obtained by methods "that offend a sense of justice." *Rochin v. California,* 342 U.S. 165, 173 (1952). Mr. Ellis submits that the admission and reliance by the State of the coerced identification by Michael Lang violated his fundamental right to a fair trial. *Valdez v. McKune,* 266 F. App'x 735, 739 (10th Cir. 2008)(A defendant may assert that his right to a fair trial has been violated by the use of testimony that has been unlawfully compelled from government witnesses.)

This case clearly involves a situation where detectives used coercive means in order to coax Michael Lang into naming a shooter then created an unnecessarily suggestive procedure to get Lang to identify that person as the shooter. Under the Court's clear statements in *Perry,* Mr. Ellis's right to fundamental fairness was violated by the entirety of the procedures used to secure Lang's statement and subsequent testimony. U.S. Const. amends. V, XIV.

In the interrogation context the United States Supreme Court has further made clear that coercive tactics may render an inculpatory statement involuntary. In *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985), the Court held that by virtue of the Due Process Clause "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." See also *Moran v. Burbine,* 475 U.S. 412,

432–434, 106 S.Ct. 1135, 1147, 89 L.Ed.2d 410 (1986). There is no reason that a witness' coerced statement is any less involuntary under the same circumstances.

Michael Lang's revelation that his story was the result of ongoing coercive interrogation tactics by Warr Acres Police Detectives James Bauman and Larry Boggess, and possibly others, establishes that the false accusation he made against Mr. Ellis was the direct result of police misconduct. The trial court denied relief on this issue by finding that Michael Lang's recantation was not true. OCCA affirmed the denial of post-conviction relief finding that the district court did not abuse its discretion in finding that Mr. Lang's recantation was not credible. This conclusion constitutes an unreasonable determination of the facts in light of the evidence presented at trial, the recorded interrogations conducted of Mr. Lang, and the evidentiary hearing. 28 U.S.C. § 2254(d)(2).

**IV.**

**THE PROCEDURE USED TO SECURE MICHAEL LANG'S IDENTIFICATION OF ANTONIO ELLIS AS THE PERSON WHO SHOT DAVID TERRY WAS COERCIVE, UNNECESSARILY SUGGESTIVE AND VIOLATIVE OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.**

Michael Lang's affidavit reveals a fact previously unknown to anyone associated with the defense that calls into question the procedure used to secure his identification of Antonio Ellis. Lang testified at the hearing that he was shown at least one photograph of Mr. Ellis prior to being taken to the apartment complex to make an identification and says he might have been shown more than one. (EH Tr. 39-40)(Petitioner's Ex. 2, ¶ 18) His being shown a photograph of Mr. Ellis prior to the in-person identification gives rise to a challenge to the

31

method used to secure his identification. Police reports and trial testimony make clear that Lang repeatedly confused Antonio Ellis with his brother Timothy Brown, Jr.[3] The new information about being shown at least one photograph of Mr. Ellis prior to identifying him, shows that the method used to secure that identification was unduly suggestive. The admission of identification testimony at trial therefore violated Mr. Ellis's due process right to a fair trial. U.S. Const. amends. V, XIV.

Eyewitness mis-identification testimony is the leading cause of wrongful conviction in the United States.[4] The unreliability of eyewitness identification evidence was recognized by the United States Supreme Court in *United States v. Wade*, 388 U.S. 218, 228-229 (1967) wherein the Court observed:

> The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification...A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '(t)he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors than all other factors combined.' (citations omitted)

The Court went on to recognize that once a witness has selected a suspect, s/he is not likely to go back on that identification. *Id.*

---

[3] Curiously, the district court found that Lang's confusion of Mr. Ellis and his brother showed that his statement was not coerced. However, the record remains silent about exactly when and how Lang figured out who was who in order to make an identification.
[4] According to the Innocence Project website over 75% of the 275 wrongful convictions overturned by DNA evidence were the result of mis-identification.
http://www.innocenceproject.org/Content/Eyewitness_Identification_Reform.php.

In-court identifications that are the result of an initial identification by photograph should be set aside if the photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)    *See also Manson v. Brathwaite*, 432 U.S. 98 (1977); *Richardson v. State*, 1979 OK CR 100, ¶ 12, 600 P.2d 361, 365.  That rule was reaffirmed in *Perry*, 565 at 237-240.  The formulation of the "substantial likelihood of irreparable misidentification" rule reflects recognition by the Supreme Court that out-of-court eyewitness identification testimony, which stands on precarious ground, may be rendered inadmissible if the procedure utilizing a photograph of only the defendant to secure identification is so suggestive the identification process itself creates a substantial likelihood of misidentification.

In *Neil v. Biggers*, 409 U.S. 188, 198 (1972), the Court considered the impact of the suggestive pre-trial procedure on in-court testimony regarding that procedure.    The *Neil* Court emphasized that it is the **likelihood of misidentification** itself that creates a due process violation, not that the defendant had been misidentified.  The *Neil* Court further clarified that the purpose of the application of the exclusionary rule in this context was to "deter the police from using a less reliable procedure where a more reliable one may be available...." *Id.*  This was also reaffirmed in *Perry*, 565 U.S. at 237-240.  In fact, the *Perry* Court recognized that the Due Process Clause creates a check on the admission of eyewitness identification when the police have arranged suggestive

circumstances leading the witness to identify a particular person as the perpetrator of a crime. *Id.* at 232.

In *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977), the Court moved the analysis a step forward and noted that it is when law enforcement uses a procedure that is both suggestive and unnecessary that due process concerns arise. The factors to be considered in determining whether an extra-judicial identification procedure tainted the subsequent in-court identification are: 1) prior opportunity of the witness to observe the defendant during the alleged criminal act; 2) degree of attention of the witness; 3) accuracy of the witness' prior identification; 4) the witness' level of certainty; and 5) the time between the crime and the confrontation.[5] *Id.*

Two factors make the identification process in this case unnecessarily suggestive. First, the coercive interrogation process set out in detail above made the process unduly suggestive. The detectives suggested to Mr. Lang through threats of prosecution (and the death penalty) if he did not cooperate that it was either him or someone else. Once the detectives' attention moved to Mr. Ellis, the use of a photograph prior to Mr. Lang's identification of Mr. Ellis at the apartment complex further solidified the already suggestive procedures. The factors to be considered in accessing whether an unduly suggestive procedure irreparably tainted an identification are all in favor of finding that the

---

[5] These factors mirror those set forth by the *Biggers* Court. However, the use of the five factors has come under fire because social science data strongly indicates the factors do not sufficiently guarantee or even relate to the reliability of identification evidence. *See* Calvin TerBeek, *A Call for Precedential Heads: Why the Supreme Court's Eyewitness Identification Jurisprudence Is Anachronistic and Out-Of-Step with Empirical Reality*, 31 Law & Psychol. Rev. 21 (2007).

identification was tainted.  Mr. Lang, both on the night of the shooting and during the state evidentiary hearing, stated that he never saw the shooter. Therefore, his identification of Mr. Ellis was irreparably tainted and the court should find the process violated Mr. Ellis'ss right to a fair trial.

Petitioner submits that the state appellate court did not decide this issue on the merits and is therefore subject to *de novo* review. *Douglas v. Workman*, 560 F.3d 1156, 1170 (2009)(Attachment 2, p. 7) If the Court finds that the state district court and state appellate court decided this issue on the merits such that 28 U.S.C. § 2254(d) applies, the Court should find that the state court's decision amounts to an unreasonable application of the law under § 2254(d)(1). Additionally, the Court should find that the state court's decision is an unreasonable determination of the facts in light of the evidence under § 2254(d)(2).  Under either provision, Mr. Ellis is entitled to relief.

### V.

**MICHAEL LANG'S COMPLETE RECANTATION OF HIS STATEMENTS TO POLICE AND HIS TRIAL TESTIMONY IDENTIFYING PETITIONER AS BEING INVOLVED IN THE HOMICIDE REQUIRES VACATING MR. ELLIS'S CONVICTION.  THE STATE COURT'S FACTFINDING ON THIS ISSUE IGNORED SUBSTANTIAL ASPECTS OF THE TRIAL AND EVIDENTIARY HEARING RECORD AND CONSTITUTES AN UNREASONABLE APPLICATION OF THE FACTS IN LIGHT OF THE EVIDENCE ALLOWING THIS COURT TO GRANT HABEAS RELIEF UNDER 28 U.S.C. § 2254(d)(2).**

**Q.  And from your knowledge, with the exception of Michael Lang, you have no evidence that connects Antonio Ellis to David Terry's murder, do you?**
**A.  No, sir.[6]**

The excerpt cited above was trial testimony from Warr Acres Police

---

[6] (Tr. IV 816)

Department Detective Larry Boggess agreeing that the only thing that connected Mr. Ellis to the crime was Michael Lang. Mr. Lang has now recanted his testimony, in its entirety, as it relates to identifying Antonio Ellis as David Terry's killer stating that what he testified to was the product of suggestion by the police. This recantation now eliminates the only evidence the State of Oklahoma had to prove Mr. Ellis was guilty of first-degree murder beyond a reasonable doubt. As the only witness to connect Mr. Ellis to the crime, if the jury had heard Mr. Lang's recantation, it could not have convicted.

Mr. Lang's revelation in September and October 2019 is the first time he alerted anyone associated with Mr. Ellis and his defense that his identification and testimony was the result of coercion and contamination by Warr Acres police detectives. No information had ever been disclosed that Lang was shown a photograph of Mr. Ellis prior to his in-person identification. Further, it was previously unknown that Warr Acres police officers and Oklahoma County Jail officers would visit with him in his cell in undocumented conversations. Mr. Lang's recantation and new information constitutes newly discovered evidence of factual innocence.

In recanting his testimony Mr. Lang has eliminated the only evidence the State of Oklahoma had connecting Mr. Ellis to the crime for which he was convicted. The recantation supports Mr. Ellis's assertion of factual innocence made for the first time the night he was arrested, asserted as a defense throughout trial, and that he now raises before this Court. His conviction is a miscarriage of justice.

The Oklahoma standard of review for cases involving witness recantation as being to determine the probable effect of the witness recantation in that case. *Cleary v. State*, 1997 OK CR 35, ¶¶ 30-31, 945 P.2d at 725.  A reasonable court reviewing the record as a whole and applying that standard could not question that Mr. Lang's testimony at the evidentiary hearing, that was completely consistent with the affidavit he signed in 2019, if heard by the jury would have necessarily changed the outcome of the trial.  This is true because, absent Michael Lang's trial testimony identifying Mr. Ellis, there was no evidence connecting him to Mr. Terry's homicide and thereby completely undermining the State's case.

The fact that both Antonio Ellis and Michael Lang were both seventeen (17) years old at the time of the homicide and investigation is a critical factor that helps explain how and why Michael Lang could be induced to falsely accuse Antonio Ellis, and one wholly ignored by the state district court.  Custodial police interrogations are "inherently compelling pressures" for anyone who finds himself in that circumstance. *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966). Custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed." *Corley v. United States,* 556 U.S. 303, 321 (2009).  It has been recognized that juveniles are even more susceptible to that type of coercion than adults. *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).

There is no question that Michael Lang was subject to repeated coercive and contaminated interrogations, interviews and conversations with law

37

enforcement between making the 9-1-1 call at 10:41 p.m. on January 6, 1999,[7] and the filing of a murder charge against both he and Antonio Ellis on January 13, 1999. We now know that these conversations even occurred in the jail where Mr. Lang was being held. The first of these interviews were, as far as the parties know, unrecorded. The unrecorded interviews that are documented include the first statement he made late in the evening of January 6th and into the morning hours of January 7th. In that statement he maintained the story he now asserts is the truth; that he was walking down Ann Arbor crossing the street at NW 50th Street near Putnam City High School when he heard a gunshot. After Crossing the street, he saw Mr. Terry laying by his car and called 9-1-1. (EH Tr. 20-22) He was repeatedly told by the detectives during that interview that they believed he was lying and he needed to "sleep on it." (Court's exhibit 1) During that interview Lang offered to take a polygraph to prove he wasn't lying.

The next day, January 7, 1999, detectives picked Lang and his step-father, up at his house, and took them back to the Warr Acres Police Department where they received permission to take Lang to the Oklahoma County Sherriff's Office for a polygraph. The polygraph was administered by Oklahoma Highway Patrolman Gary Thornberry, without a parent or counsel present, around 1:30 p.m. Lang was told he flunked the polygraph test and was interviewed by Patrolman Thornberry who advised Warr Acres detectives that Lang "confessed to him that the victim was still alive when he crossed the road to check on him and that he actually witnessed the murder and can identify the shooter..." and

---

[7] Tr. III 515.

that "...the shooter is the brother of a neighbor of Lang's." (O.R. 190) A conversation then occurred while detectives were transporting Lang back to the Warr Acres Police Department where Lang purportedly explained to the detectives "what happened." (O.R. 190-191) A second report reflects that Lang told them "...the shooter is a younger brother of Antonio" but then states the shooter "was later identified" as Antonio. (O.R. 191) That evening, after a show-up/line-up consisting of Antonio Ellis, his brother Tim Brown, Jr., and a white male named Chris Gatlin, Antonio Ellis was arrested. His arrest was based on Lang's statement and his identification of Antonio Ellis at a show up at their apartment building. That night, after arresting Mr. Ellis, his father signed a consent to search their apartment and Antonio Ellis's car. Nothing of evidentiary relevance was found during that search. Additionally, gunshot residue tests were performed on Mr. Ellis's clothes, but none was found. No blood was found on his clothes or his shoes. (Tr. IV 923-924)

The next morning, January 8, 1999, Warr Acres Detectives recorded Lang for the first time. (Attachment 5, pp. 2-27) In that recording, Lang recited general information similar to what he had told the officers on the previous day on the way back to Warr Acres from downtown. Detective Bauman can be seen in the video correcting Lang on several facts and providing additional details to the information Lang was giving. The gist of the story Lang told on the January 8, 1999 video was that Lang was at St. John's church playing basketball that evening, and he made several stops as he walked home. In the area of 47th and Ann Arbor he ran into Antonio Ellis whom he recognized as his neighbor across

the street.  Mr. Ellis asked Lang for a cigar which he didn't have.  As they approached 50th Street, Lang stated Mr. Ellis noticed Mr. Terry's white Ford Explorer at the car wash and proceeded across the street to the carwash parking lot where he pulled out a gun and yelled at Terry.  Lang stated he heard a confrontation between Mr. Ellis and Christopher Terry then heard a gunshot. Lang ran back across the street to hide from Mr. Ellis.  Mr. Ellis then ran eastbound into Dolese Park.  After Mr. Ellis ran off Lang told the officers he went back across NW 50th Street and used the payphone to call 9-1-1.

In the last recorded interview conducted on January 12, 1999, just before charges were filed, Lang's story changed as detectives put pressure on him to "tell the truth" and assured him on numerous occasions that "there is nothing we can't deal with" but that he needed to tell the "truth." (Attachment 5, pp. 27-124)  As they urge him to "tell the truth", they also provided him details of the crime scene, the location of the gunshot wound that killed Mr. Terry, corrected the distances of where Lang and Mr. Ellis must have been standing,[8] and falsely told Lang they have witnesses who connect Lang and Mr. Ellis despite Lang's repeatedly telling the detectives he and Mr. Ellis did not know each other.

False witness statements by juveniles is one of the leading causes of wrongful conviction of juvenile defendants in the United States.  A study by Tepfer, Nirider, Trecarico published in 2010 revealed that a "false statement

---

[8] Lang's testimony that the shooter was standing ten to twelve feet away from Mr. Terry when he was shot was wrong.  Firearm and tool mark expert Greg Karim testified that he conducted tests that showed the shooter was standing approximately eighteen (18) inches away from Mr. Terry when he was shot.  (Tr. V 989)

made by a youth out of concern for his own penal interest" contributed to 37.9%

of the 103 wrongful juvenile convictions analyzed in the study.     *Arresting*

*Development, Convictions of Innocent Youth*, 62 Rutgers L. Rev. 879, 910 (2010).

Aside from Mr. Lang's credible explanation about why he testified the way he did,

and why he has now come forward, there are aspects of Mr. Lang's recantation

and the trial record itself that support a finding that Lang's initial story to police

was inaccurate and his testimony was false. None of these factors are mentioned

by the district court or the OCCA in their respective orders denying post-

conviction relief. Therefore, habeas relief is available to Mr. Ellis because the

state court decision rests on an unreasonable determination of the facts in light

of the evidence presented at trial and at the evidentiary hearing. 28 U.S.C. §

2254(d)(2). Because the state court ignored significant parts of the record in

making its determination, Petitioner submits that those findings are not entitled

to a presumption of correctness under 28 U.S.C. § 2254 (e)(1) as the trial and

evidentiary hearing transcripts and evidence rebut the presumption of

correctness by clear and convincing evidence.

    In *Fernandez v. Capra*, 916 F.3d 215 (2019), the United States Court of

Appeals for the Second Circuit found that the state court's determination that a

witness' recantation of his identification of the Petitioner at trial was not credible

was an unreasonable determination of the facts in light of the evidence produced

at a state evidentiary hearing. In granting relief in a case with facts extremely

similar to the facts here, the Second Circuit noted that the New York state court,

like the court here, determined that the credibility of the recanting witness was critical. *Id.* at 227. The court then decided that his recantation was not credible.

While the state court initially observed that the recanting witness's hearing testimony was plausible and there was not showing that the witness had a motive in falsely recanting, the court then unreasonably relied on the witness' courtroom demeanor and the length of time it had taken for him to come forward as grounds for discrediting his testimony. *Id.* at 228. Further, the state court relied on the fact that the witness had withstood cross-examination at trial as reason to credit his trial testimony over his recantation testimony. *Id.* at 228-229. The state court also found that if the witness told the truth about some facts and circumstances that he did not recant, he must have told the whole truth at trial. *Id.* at 228. Particularly informative to this case, the federal appellate court noted that the state court gave too much weight to the witness's testimony at trial that he had had not been shown photographs of the Petitioner before his identification despite the witness's testimony at the hearing that he lied and explained that the detectives told him not to testify about their discussions. *Id.* at 229.

Ultimately the Court found that "[T]he state court's decision contains sound reasons to credit Canela's recantation, and no plausible reason to discredit it. Accordingly, the state court's rejection of Canela's recantation was an 'unreasonable determination of the facts in light of the evidence presented" under § 2254(d). The same should be found here in relation to Michael Lang's recantation.

The factors identified by the trial court for concluding that Mr. Lang's recantation was not true are minimal in light of the circumstances that show that his recantation, consistent with the first thing Lang told the police following Mr. Terry's shooting, is fully supported by the recorded interrogations, the crime scene, Mr. Ellis's alibi presented at trial, and the testimony of other eyewitnesses in the case. Moreover, and completely ignored by the trial court and OCCA, a second juvenile witness with whom the detectives engaged the same coercive interrogation techniques, recanted his testimony at trial. The trial court's order completely ignored that Michael Lang was threatened with being prosecuted for murder, threatened with the death penalty and fed information that conformed to the detectives' theory; a theory that was arrived at through no actual investigation. The state court disregarded all of the evidence/information that corroborates Mr. Lang's recantation and explanation about why he testified falsely, and only regarded the few circumstances that were actually based on accurate information. Beyond that, those things that the state court relied on finding Mr. Lang's trial testimony reliable where actually things that the taped interrogations revealed were fed to Mr. Lang by the detectives or that he would have known from being at the crime scene.

First, the court relied on the fact that during the January 8th interview, Lang described and demonstrated how the victim put his arm up across his face and body to protect himself from the bullet. (Attachment 1, p. 24) However, as more fully described below, Detective Bauman is who actually suggested and demonstrated that. The state district court's order even states on the next page

that "It was later revealed in the video of Lang's January 12th interview that Lang had not even been aware that Terry had been shot though the arm prior to Detective Bauman informing him of that fact that day." (Attachment 1, p. 25) It is hard to reconcile those two fact findings by the lower court.

Second, the court relied on the fact that Mr. Lang "consistently maintained that when he approached Terry in the carwash parking lot, he was laying face down on his left side with his left arm underneath him; Lang did not see blood on him." (Attachment 1, p. 25) This fact has nothing to do with Lang's credibility as there is no question that he was at the crime scene and walked up to the body as it lay on the ground.

Third, the court observes that "Lang's testimony at the evidentiary hearing that he only identified Petitioner as the shooter because the detectives suggested Petitioner's name to him and showed him photographs of Petitioner…" but that he did not initially identify Mr. Ellis, but instead identified his brother. (Attachment 1, p. 25) The state court further pointed out that even after Mr. Ellis's arrest, Lang still did not know the name of the person he identified as the shooter and that he was still under the impression that Antonio was actually his younger brother. (Attachment 1, p. 25-26) This fact does not establish that Mr. Lang's recantation was not credible but rather supports his testimony that he was merely adopting information that was being given to him and was at times confused. The trial record is absolutely silent as to how Mr. Lang went from confusing Mr. Ellis and his younger brother to being able to identify him at trial but certainly calls into question his in-court identification.

The court credited Detective Bauman's testimony that Lang was the first person to identify Mr. Ellis then concludes "This Court has been presented with no reason or motivation for Detective Bauman to be untruthful in his testimony, then or now." However, OCCA in fact found that Bauman's hearing testimony relating to this matter was in fact not consistent with his trial testimony or police reports, and therefore was a lie. It is not hard to imagine why Detective Bauman would offer false testimony at an evidentiary hearing questioning whether the only murder case he ever investigated was botched.

Finally, and perhaps most incredibly, the court found that Lang's testimony that he simply was going along with what the detectives were telling him was undermined by the video of the January 12th interview because in it they could not get him to say that the shooter ran southbound. (Attachment 1, p. 27) This is an incredible finding considering all of the information that the detectives fed to and got Lang to adopt into his story including which side of the street he was on, what the motive for the crime was, and the distance the shooter was standing from Mr. Terry when he shot him.

Conversely, the state court's fact finding wholly disregards many salient parts of the evidence presented. The most significant facts that were wholly ignored by the state court in finding Mr. Lang's recantation was not credible include the following:

1.    **Michael Lang's first statement, made to the 9-1-1 operator, is consistent with what he first told the police and with what he now says is the truth.**

Michael Lang's statement to the 9-1-1 operator, before he had time to think about or fabricate his story, was that he heard a gunshot then saw a person down.  (State's Ex. 44)(Tr. III 573) His story throughout the first night of questioning on January 6, 1999, was that he was across 50th Street and heard a gunshot. Then he crossed the street and walked towards the carwash where he saw Christopher Terry on the ground. (Petitioner's Ex. 3)  He now maintains that he never saw the person who shot Mr. Terry.  The fact that his statement in the 9-1-1 call made immediately upon observing Mr. Terry shot and laying on the ground, is probative of the truth.  There was not time to fabricate a story and it is the version he told throughout the first night of being interrogated and up until he was told he had flunked the polygraph.

**2.    Detective Bauman's trial testimony was that he helped Lang with a story that "fit the crime," that he expressed his opinion that it was supposed to be a carjacking and told Lang that Mr. Terry was shot through the arm all supports Michael Lang's recantation.**

Despite the state court findings, certain aspects of what Michael Lang describes in his affidavit and testified about relating to the police interrogations cannot be disputed as Warr Acres Police Detective James Bauman confirmed much of it during his trial testimony.  On cross-examination, Detective Bauman admitted that he helped Lang craft a story that fit the information they had about the crime. (Tr. V 1047) Bauman agreed that he and Detective Boggess had told Lang that he had to be standing closer to see the shooting which prompted Lang to change his story. (Tr. V 1047) He also admitted he told Lang that he believed someone was trying to carjack Mr. Terry's car which became the theory of the case when Lang wove that into his story. (Tr. V 1086) Additionally, Lang testified

that the detectives told him Mr. Terry was shot through the arm. (Tr. III 616-617)

All of Detective Bauman's admissions are consistent with Mr. Lang's statement that ultimately his statement and testimony was based on what was suggested to him by the detectives and police officers he was around in the days following the homicide using the interrogation tactics cited above. Mr. Bauman's testimony offered at the evidentiary was factually incorrect and therefore failed to shed any helpful light on the circumstances of the interviews.

### 3.    Detective Bauman admitted at trial he threatened Lang in his attempt to get him to "cooperate."

Michael Lang testified at trial that he was threatened with being charged with murder and with the death penalty. (Tr. III 619) He reiterated that he was threatened with the death penalty in his affidavit and at the evidentiary hearing. At trial, Detective Bauman admitted he threatened Lang with prosecution. (Tr. V 1085) He initially denied threatening him with the "needle" but when asked if Lang was lying if he testified to that, Bauman's response was "no." Such threats are real life consequences that are not supposed to be used during the interrogation of a juvenile.

### 4.    State's witness Justin Ward was threatened in the same way as Lang and initially gave the police a false statement before changing his testimony during trial.

Mr. Ellis's friend Justin Ward was interviewed by Detective Bauman in April and May 1999.   He was sixteen (16) years old at the time an in special education classes. (Tr. IV p. 835, 865) Initially, Mr. Ward told Detective Bauman that Mr. Ellis told him he admitted to shooting Mr. Terry at school the day after

the homicide. However, Mr. Ward recanted his statement during trial. Mr. Ward testified that in an interview at the police department, after finding out Ward had lied about being at work the night of the homicide, Detective Bauman told Ward he would go to jail for a long time if he "did not come clean." (Tr. IV 847) Bauman also told him he had been identified as being at the scene of the homicide. (Tr. IV 871-872) That threat scared Ward "to death." (Tr. IV 850) Ward testified he just wanted to go home but they told him he couldn't go home until he told them a story. (Tr. IV 873) As a result of that fear Ward told Bauman that Ellis shot Mr. Terry for his Explorer. (Tr. IV 851-853)(Trial Court's Ex. 1) Ward also told police that Ellis told him that Lang was there. (Tr. IV 851) Finally, Ward told the police that approximately one month before the shooting Mr. Ellis told him he needed a gun to protect himself. (Tr. IV 861)

Prior to trial Ward revealed to Assistant District Attorney Shannon Henson that he lied about Mr. Ellis saying he had shot Mr. Terry and about Ellis looking for a gun a month before the homicide. (Tr. IV 861-863) He tried to correct his story prior to preliminary hearing but one of the assistant district attorneys on the case at that point, and Detective Bauman, told him he would go to jail for perjury. (Tr. IV 876) At trial, Ward testified that he was not at school with Mr. Ellis the day after the homicide because he had been suspended; a fact Bauman never checked. (Tr. IV 863-864) He also testified that he and Ellis had talked about getting a gun for protection but Ellis wasn't serious about it. (Tr. IV 875) Despite telling Detective Bauman he had seen Ellis get in fights, that was not

true either. (Tr. IV 881) Finally, Ward testified at trial that Mr. Ellis was not in a gang and statements he made saying he was were not true. (Tr. IV 883)

As is not uncommon with juveniles, Ward was willing to implicate one of his best friends in a homicide after being threatened with going to jail himself if he did not tell the police something. When he first tried to admit to a prosecutor and the lead homicide detective that he was not telling the truth he was further threatened with jail time for perjury. Fortunately for Ward, he was able to consult with an attorney who was present during his trial testimony. Mr. Lang never had his own attorney despite being treated as a suspect then being charged along with Mr. Ellis.

**5.    Lang's testimony contradicts the testimony of two reporting witnesses and crime scene information that was known to detectives during his interrogation.**

Further indication that Lang's previous recitation of what happened is unreliable is the fact that Lang testified that he did not see anyone run south or hear a car drive away when those facts are established by independent witnesses who testified at trial. Don Lowry, a resident who lived across the street from the Vend-A-Car carwash. (Tr. V 1092) Mr. Lowry heard what he believed what was a gunshot while he watched the 10:00 p.m. news on the night of January 6, 1999. Shortly thereafter he heard the tire squeal of a car taking off fast. (Tr. V 1093) He then heard emergency vehicles and went to the carwash to see what was happening. He reported what he had heard the police that night. (Tr. V 1094-1095) Michael Lang was asked if he heard a car speed away at trial but denied hearing that. (Tr.III 619-620) Witness Jason Doty also reported that he

was driving westbound on NW 50th Street when he observed a man on the ground in the parking lot of the carwash and a black male standing in the parking lot. He reported seeing a dark colored Oldsmobile or Monte Carlo, with a white male driver, pull into the convenience store between the car wash and the Willow Cliff Apartments. (Court's Ex. 4) Again, Michael Lang purported to not have seen another car in the area after he found Mr. Terry at the carwash. (Tr.III 620)

The testimony of these two witnesses take on even more importance in light of Michael Lang's recantation because they support a theory that more than one person was involved in the shooting and drove off in a car. The fact that Michael Lang doesn't account for that can be directly tied with the fact that the Warr Acres homicide detectives did not include that information in what they were telling Lang during his interviews. Their testimony has always undermined the reliability of Lang's version of what happened and now take on more significance since he has recanted his testimony. It is also consistent with Mr. Lang's original story that he was south on Ann Arbor when he heard the gunshot and would not have been in a position to necessarily see or hear those things.

It bares noting that Mr. Lang testified that Mr. Terry was vacuuming his car at the time the shooter approached him. (Tr.III 567) However, no vacuum hose was found in the car and Mr. Terry was on the opposite side of the vehicle from the vacuum hoses. (Tr.III 521)(Tr.III 720)(State's exhibit 8)

Michael's Lang's recantation, both taking by itself and in light of other testimony and evidence at trial, it is clear that Lang's recantation would have a

probable effect on the verdict in this case. In fact, if Lang had recanted prior to trial to the degree he has now recanted, Mr. Ellis could not have been tried for Christopher Terry's murder. Accordingly, this Court should vacate Mr. Ellis's conviction in the interest of justice.

**6.    Greg Karim's testimony about the distance the shooter would have been from Mr. Terry when he was shot contradicts the story fed to Mr. Lang by detectives and shows its unreliability.**

The State's firearm and tool mark expert, Greg Karim, testified that the shooter would have likely been standing eighteen (12) to twenty-four (24) inches away from Mr. Terry when he was shot. That renders Mr. Lang's trial testimony that the shooter was approximately ten (10) feet away unreliable and unbelievable.

**7. Mr. Lang came forward on his own, and was willing to turn himself and serve a jail sanction to talk to Oklahoma County prosecutors in order to correct this injustice. When the State would not agree to dismiss the charge again Mr. Ellis, Mr. Lang voluntarily testified at the state evidentiary hearing opening himself up to cross-examination**

Mr. Lang reached out to the Innocence Project. No one representing Mr. Ellis reached out to him to question him about his participation in Mr. Ellis's prosecution. Not only was he willing to tell his story to the Oklahoma Innocence Project, he was willing to talk to the Oklahoma County District Attorney's Office.

During a meeting with Mr. Ellis's attorney and investigator, an arrangement was made by phone with Oklahoma County prosecutors for Mr. Lang to give them an interview despite the fact that he did not have to do that. (Hr.Tr. 117-118) Prior to the tentative interview date it was discovered that Mr. Lang had an active warrant in Cleveland County for failure to report as necessary

to Mental Health Court. (Hr.Tr. 118) Mr. Lang surrendered himself and served a jail sanction to clear the warrant so that he could talk to prosecutors and recant his testimony. It was during that period in the Cleveland County Jail that the prosecutors were able to interview him and hear his recantation firsthand. (Hr.Tr. 119) Neither the State nor the court offered an explanation why he would make such a sacrifice to talk to authorities if his recantation is a lie and no plausible reason can be discerned from this record.

Mr. Lang's mental health history and criminal convictions, to the extend they may impact his credibility, are not so significant that this Court can disregard his consistent and detailed recantation. Being mentally ill does not necessarily render a witness incompetent. The court failed to connect Mr. Lang's mental health history to his ability to perceive reality or recall what happened in this case fifteen years before his diagnosis. Moreover, to the extent some of the State's cross-examination questions related to his religious or spiritual beliefs, those matters are improper subjects for impeachment. Okla. Stat. tit. 12, § 2610. It is notable that the state district court did not weigh Mr. Lang's mental health history as a factor against his credibility.

Finally, Mr. Lang didn't just sign an affidavit recanting his testimony. He gave live testimony and subjected himself to cross-examination. Counsel for Mr. Ellis did not provide Mr. Ellis with police reports or trial transcripts prior to the hearing to refresh him memory for risk that the State of Oklahoma would argument that his memory had been impacted by those things. (Hr.Tr. 7) While there were a few things he was unable to remember about the interviews and his

trial testimony, for the most part his memory was incredibly clear about what had happened.

Based on all of these factors, most of which went unacknowledged by the lower court, this Court should find that Mr. Lang's recantation is credible in light of the circumstances of the questioning by police and the trial record. It is consistent with what he originally told police prior to coercive questioning. As such, if the jury had heard his recantation and observed his demeanor it would have had a probable effect on the verdict. Accordingly, Mr. Ellis's conviction should be vacated by this Court and his case remanded for a new trial in the interest of justice.

If the Court determines that the state court factfinding is entitled to the presumption of correctness, then Petitioner has rebutted the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Moreover, the above facts show that the state court's determination of the facts in light of the evidence presented was unreasonable. Mr. Ellis asks the Court to grant him habeas relief in the interest of equity and justice.

## VI.

**THE SUPPRESSION OF INFORMATION RELATING TO A PHOTOGRAPH OF ANTONIO ELLIS BEING SHOWN TO LANG PRIOR TO LANG PICKING PETITIONER OUT OF THE LIVE LINE-UP VIOLATED *BRADY V. MARYLAND* AND ITS PROGENY IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL.**

A citizen accused of a crime is denied due process of law when the prosecution suppresses evidence which is favorable to the accused and is material either to guilt or to punishment, and a conviction obtained when such

evidence is suppressed must be reversed. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).    To establish a *Brady* violation, a defendant must show that the prosecution suppressed evidence that was favorable to him or, in other words, exculpatory, and that the evidence was material. *United States v. Bagley*, 473 U.S. 667 (1985).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Green*, 527 U.S. 263, 280 (1999).  The United States Supreme Court has clarified that when reviewing a *Brady* issue for materiality the reviewing court should not engage in a sufficiency of the remaining evidence analysis.  In *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) the Court stated:

> The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. (emphasis added)

*See also United States v. Bagley*, 473 U.S. 667 (1985)(holding that under *Brady v. Maryland* evidence that was withheld is material if there is a reasonable probability had the evidence been disclosed to the defense the result of the proceeding would have been different.)

Exculpatory evidence includes materials that could be used to cast doubt on prosecution theories, or to discredit the police investigation. *Stano v. Dugger*,

901 F.2d 898, 903, n.28 (11th Cir. 1990); *Bowen v. Maynard*, 799 F.2d 593, 612 (10th Cir.), *cert. denied*, 479 U.S. 962 (1986). Exculpatory evidence also includes information that could impeach the credibility of prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 154, (1972). The law is clear that "when the credibility of a witness may be determinative of the guilt or innocence of the defendant, nondisclosure of evidence affecting his credibility 'requires a new trial.'" *See Napue v. Illinois*, 360 U.S. at 269 (1959). Petitioner filed a motion for discovery on March 8, 2000 requesting information about any and all potential exculpatory evidence. Such evidence is required to be disclosed under *Brady* as well as the Oklahoma Criminal Discovery Code even absent a specific request. *See* Okla. Stat. tit. 22, § 3001 *et seq.*

The newly discovered information about Lang being shown a photograph prior to identifying Mr. Ellis as the shooter in this case was never disclosed to defense counsel. It is not contained in any known police report. Lead defense counsel Michael S. "Mickey" Homsey and Terry McMillan both testified at the state evidentiary hearing that they were not aware of the information about Lang being shown a photograph. If they had been aware of that they would have moved to suppress the identification which was clearly the cornerstone of the State's case. (EH Tr. 131-132; 143-145)

The reason why Lang's new information about being shown a photograph is critical information is because the timing of his being shown a photograph calls into question the way detectives secured his identification of Antonio Ellis as the shooter and impeaches the investigation itself as well as his testimony.

While defense counsel impeached the detectives' method of interrogation of Lang, there was no information on which to challenge his actual identification of Ellis. Armed with information that Lang had seen a photograph of Ellis before the in-person line-up, defense counsel could have thoroughly cast doubt on the identification itself as well as moved to suppress the identification as being the result of an unnecessarily suggestive identification process.

Many of Lang's first interviews with law enforcement were not recorded. The first recorded interview occurred on January 8, 1999, the day after Lang picked Ellis out of a live show-up in the parking lot of the Willow Cliff Apartments. As such it was even more important that law enforcement reports accurately reflect what had occurred during the unrecorded interviews. The absence of a recorded interview that shows Lang being shown the photograph or photographs should not be counted against Mr. Ellis on this point as it is the State that has the duty to disclose such information under the Due Process Clause and *Brady*.

Because the State failed to disclose that Lang had been shown a photograph or photographs of Mr. Ellis before being taken to identify him violated Petitioner's fundamental right to due process as construed by *Brady* and its progeny, his conviction must be reversed and remanded for a new trial. The state courts denied relief on this claim based on the state district court's determination that Lang's new evidence was not credible. Petitioner submits that that does not constitute a decision on the merits thereby allowing the Court to conduct a *de novo* review. However, if the Court finds the state court made a

merits determination, the state court's ruling on this issue was an unreasonable application of *Brady*. 28 U.S.C. § 2254(d)(1). Additionally, the credibility determination constitutes an unreasonable application of the facts in light of the evidence presented at the state post-conviction hearing. 28 U.S.C. § 2254(d)(2). The state court's factfinding is not entitled to deference because a review of the entirety of the record, not just those portions that benefit the State, rebuts the presumption of correctness by clear and convincing evidence if this Court deems that 28 U.S.C. § 2254(e)(1) applies.

Mr. Lang's evidentiary hearing testimony went unrebutted by the State. Detective Bauman lied at the evidentiary hearing insisting, despite his prior testimony and police reports, that Mr. Lang named Mr. Ellis the first night Lang was questioned. OCCA acknowledged that he lied but inexplicably found, *sua sponte*, that the perjured testimony harmless. (Attachment 2, p.7) Given his perjured testimony on the issue of when Mr. Lang named Mr. Ellis as a suspect, his testimony about not showing Mr. Lang a photograph is also questionable. Additionally, Detective Bauman conceded at the hearing that he was not the only detective talking to Lang, and that he could not say for sure Lang had not been shown a photograph by somebody.

Petitioner prays that the Court will grant him habeas relief on this issue and order the case remanded to the State court with instructions to dismiss.

## VII.

**CONSTITUTIONAL ERROR IN MR. ELLIS'S TRIAL RESULTED IN THE CONVICTION A PERSON WHO IS FACTUALLY INNOCENT OF THE CRIME HE WAS CONVICTED OF THERBY ENTITLING HIM TO HABEAS RELIEF UNDER THE DUE PROCESS CLAUSE OF FOURTEENTH AMENDMENT OF THE UNITED STATES CONSITUTION.**

In general, free standing claims of actual innocence are not recognized by the Tenth Circuit. *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019); *Vreeland v. Zupan*, 906 F.3d 866, 883 (10th Cir. 2018). The Court's holding in *Farrar* was ground in *Herrera v. Collins*, 506 U.S. 390, 400 (1993) wherein the United States Supreme Court held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Farrar*, 924 F.3d at 1131.

Here, Petitioner has a factual innocence claim. In part, he is asserting innocence in order to overcome a procedural default of his cumulative error claim. (See part VII, *infra*.) However, he is also asserting that constitutional error in his case, revealed by the newly discovered evidence contained in Michael Lang's 2019 affidavit and hearing testimony, resulted in the conviction of one who is more likely than not, innocent. In that way, he asserts a substantive innocence claim but one that is directly related to the alleged constitutional error. Therefore, the actual innocence claim he now raises is not the same as the "freestanding" innocence claim rejected in *Farrar* but one tethered to constitutional error.

Michael Lang's credible recantation of his trial testimony, coupled with the fact that his hearing testimony is better corroborated by the evidence at trial than his trial testimony, shows that Mr. Ellis' conviction is a miscarriage of justice.  The trial that resulted in his wrongful conviction was marred by coercive interrogation tactics against a juvenile witness who now says clearly, consistently and unequivocally that the part of his testimony identifying Mr. Ellis as the shooter was false.  The falsity of that testimony is newly discovered; a fact uncontested by the State and by the district court.

A habeas writ is "a fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Childers v. Crow*, 1 F.4th 792, 807 (10th Cir. 2021)(Seymour, J. dissenting) quoting *Harris v. Nelson*, 394 U.S. 286, 291 (1969).  Habeas courts have the equitable discretion to ensure that federal constitutional errors do not result in the incarceration of innocent people. *Herrera*, 506 U.S. at 404.  In light of the constitutional error that infected Mr. Ellis' trial, this Court should exercise the power granted to it and order that Mr. Ellis' conviction be vacated in the interest of justice.

## VIII.

**THE CUMULATION OF ERROR IN THIS CASE RESULTED IN THE CONVICTION OF ONE WHO IS FACTUALLY INNOCENT AND REQUIRES THE COURT TO GRANT HABEAS RELIEF IN THE INTEREST OF EQUITY AND JUSTICE.**

The notion of fundamental fairness entitles an accused to a fair and impartial trial.  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).  The Tenth Circuit Court of Appeals has observed that "[T]he Due Process Clause of the Fifth Amendment protects against denials of fundamental

fairness that are "'shocking to the universal sense of justice.'" *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990)(citations omitted).

In addition to reviewing the individual errors raised herein, Petitioner asks the Court to conduct a cumulative error analysis to determine whether, in light of the newly discovered evidence when considered with the evidence presented at trial, the cumulation of constitutional errors in Mr. Ellis's trial rendered the trial fundamentally unfair. A cumulative-error analysis "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) citing *United States v. Toles*, 297 F.3d 959, 972 (10th Cir.2002). The "linchpin" of the analysis is that "...an error was committed which, when considered with other circumstances, led to a fundamentally unfair trial." *Rivera*, 900 F.2d at 1477.

Here, not only does the newly discovered evidence reveal numerous constitutional errors in the trial, it reveals that those constitutional errors resulted in the conviction of one who is factually innocent of the crime for which he has been convicted. The Tenth Circuit does not recognize free standing innocent claims. In *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019) the Court noted that the United States Supreme Court "...has repeatedly rejected such claims, noting instead that '[c]laims of actual innocence based on newly discovered evidence have never been held

to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings.'" *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019) citing *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

Here, Mr. Ellis does not submit a freestanding actual innocence claim absent constitutional error. Rather he asserts that because of the cumulation of constitutional errors related to the interrogation and tainted identification process used to obtain an identification by the only witness against him, a juvenile at the time like Mr. Ellis, the State of Oklahoma convicted one who is actually innocent. A cumulative error analysis allows the Court to look at all of the evidence, old and new, to determine whether the cumulative constitutional error resulted in the conviction of one who is actually innocent. *See House v. Bell*, 547 U.S. 518, 538 (Clarifying that the rule handed down in *Schlup v. Delo*, 513 U.S. 298 (1995) requires the reviewing court to take a holistic approach to reviewing newly discovered with the evidence presented at trial.)

The new evidence brought to light by Mr. Lang's retraction of his trial testimony shows that over the course of numerous interviews, during which he did not have the support of a parent or adult, Mr. Lang was coerced into making incriminating statements implicating Mr. Ellis. In the course of those interrogations Mr. Lang was threatened with prosecution and with the death penalty. As he adopted the information fed to him by

the detectives he was promised leniency. These facts are evident from the recordings of the interrogations and therefore corroborate what Mr. Lang testified to at the state evidentiary hearing.

There has never been a dispute that Lang's identification of Mr. Ellis as the shooter is the only evidence that connected Mr. Ellis to Mr. Terry's murder. Mr. Lang's repudiation of his identification of Mr. Ellis is consistent with what he told the 9-1-1 operator upon finding Mr. Terry lying on the ground and before he had time to fabricate a story. It is also consistent with the what he originally told the detectives.

The new evidence is in contrast to Mr. Lang's trial testimony which, at times was inconsistent and uncertain. It was also contradicted by forensic testimony showing that the shooter was much closer than Lang indicated. Additionally, Lang's testimony placed Mr. Terry on the wrong side of the car based on the location of the vacuum cleaners at the car wash. The newly discovered evidence compliments the alibi evidence Mr. Ellis presented at trial; that he was at home at the time of the shooting talking to his girlfriend on the telephone.

The cumulation of constitutional error in this case, coupled with compelling evidence of innocence, call for vacation of Mr. Ellis' conviction.

## IX.

### PRAYER AND REQUEST FOR RELIEF

Mr. Ellis prays that the Court issue a writ of *habeas corpus* ordering that his state court conviction be vacated with any further instructions that the Court deems necessary to meet the ends of justice and equity.

Respectfully submitted,


s/Andrea Digilio Miller
ANDREA DIGILIO MILLER (OBA # 17019)
Oklahoma Innocence Project
800 N Harvey Avenue, Suite 317
Oklahoma City, Oklahoma 73102
(405) 208-6161
admiller@okcu.edu
ATTORNEY FOR PETITIONER

### VERIFICATION

### Federal Habeas Corpus Petition
### Pursuant to 28 U.S.C. § 2242

I am authorized on behalf of Petitioner Antonio Ellis to verify under penalty of perjury that the foregoing is true and correct.

s/ Andrea Digilio Miller
Andrea Digilio Miller
Attorney for Petitioner


### CERTIFICATE OF ELECTRONIC SERVICE AND FILING

This is to certify that on May 18, 2022, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing. An electronic copy will be served on the Office of the Attorney General once that office enters an appearance in this case. There are no non-ECF registrants who will be counsel in this case.

s/Andrea Digilio Miller